Edward Charles PICKENS, Petitioner,

v.

A. L. LOCKHART, Director Arkansas Department of Corrections, Respondent.

No. PB–C–81–141.

United States District Court, E. D. Arkansas, Pine Bluff Division.

June 10, 1982.

Ray Hartenstein, Little Rock, Ark., for petitioner.

Randy McNair, Victoria Fuel, Asst. Attys. Gen., State of Ark., Little Rock, Ark., for respondent.

## MEMORANDUM OPINION

WOODS, District Judge.

### FACTS

Petitioner, a 21-year-old black male, was a participant in one of the most heinous crimes in the history of this State. As frankly described by one of petitioner's witnesses, "[I]f there was ever a case that was made for the death penalty, this was one of those cases." (Isbell Dep. 27.) After murdering one victim and stealing his car, petitioner and his two companions went to a rural grocery store at Casscoe in Arkansas County at 1:30 p. m. on October 20, 1975. Entering with drawn weapons consisting of a sawed-off shotgun and a .22 pistol, they robbed the owner and seven customers in the store, and two of them raped the clerk, a 62-year-old grandmother. They then made the victims lie face down on the floor and in execution style shot them in the back of the head with a .22 pistol. Their victims were black and white, young and old, male and female. Several of the victims were shot a second time after the pistol was reloaded. Although charged with two other capital felony murders, petitioner was tried for the murder of Wes Nobles, a 76-year-old black man. Nobles was one of those shot a second time. The store owner implicated Antonio Clark and petitioner in the shootings, since they were dark complexioned. He absolved the light complexioned man (Gooch) from any of the firing.[1]

Q Was anything said by these men that were doing the firing?

A There wasn't anything said when they started in. They just come in and went to shooting. I was shot in the shoulder.

Q Did the light complexioned man do any of the firing?

A No sir.

Q Was there ever a pause in the firing?

A They went back into the store, emptied the shells out and I heard them say that big man is going to have to be shot again.

Q Who were they talking about?

A I don't know who. Wes Nobles was laying right there. He just barely raised his head up. He said you mother fucker you have got to go and he shot him right there and then he turned around and started shooting. He shot Jimmy Scherm again. He shot Mr. Lockridge again, Floyd Lockridge, Jerry Lockridge and Sherm.

. . . . .

Q Is it still your testimony that two men did the firing?

A Yes sir.

Q Did the gun change hands?

A It did.

Q Yesterday I believe you stated that it was the two dark ones.

A That is correct. (Tr. T. 151, 222.)

According to the arresting officers and Mr. Baine, the Prosecuting Attorney, Mr. Gooch was a very light-skinned, Spanish-appearing person (Ha. T. 301; Tr. T. 182, 197). Petitioner's defense at the trial was that he did not do any of the shooting. It should be noted that Antonio Clark relied on the same defense at his trial where he also received the death penalty. See Clark v. State, 264 Ark. 630, 573 S.W.2d 622, 625 (1978). Clark at his trial admitted that he had raped the clerk. The other rapist is not definitely identified, but when captured, the petitioner was wearing the clerk's wedding ring. She testified that at one time Pickens had the .22 pistol, but she did not know if he fired the shots. In his written statement given to the arresting officer in Memphis, petitioner admitted that he had the .22 pistol when they first entered the store and Clark had the shotgun, but that he gave the

1. Gooch pled guilty and received a sentence of life without parole.

pistol to Clark and Clark gave the shotgun to Gooch. This conflicts with the testimony of one of the surviving victims who entered the store while the robbery was in progress. This witness placed the shotgun in possession of Pickens. Near the scene where Gooch and Pickens were apprehended in Memphis, a passerby found the .22 pistol which ballistic tests identified as the source of the shots that killed Wes Noble. There is considerable other testimony connecting Pickens with this pistol at various times during the episode. We have already set out the testimony of the store owner. The female clerk placed the pistol in Pickens' possession at one time. He admitted in his signed statement that when they entered the store he had the pistol in his possession. His role in the robbery was to herd the customers into a back room as they came into the store. He testified as follows:

Q They had them all in the backroom. Is that right? Were they all in the backroom laying down on the floor?

A After we pulled out the guns and took them into the back room.

Q From that point on what were you doing?

A I was getting the people as they came in. Several started coming in. One was sitting in his car. I went and got him out of his car.

Q You went and got him. Did you have a gun?

A Yes sir, I did. (Tr. T. 211.)

Later he gave the following testimony:

Q Did you use a weapon in that store?

A When I first came in I did have a weapon.

Q You don't claim ownership to it, do you?

A No sir.

Q You used it, didn't you?

A I handled it.

Q Did you ever handle the pistol?

A Yes sir.

Q You are sure now?

A Yes sir.

Q Mr. Goacher said the two dark ones did the shooting. Is that correct?

A Yes sir, just one did the shooting.

Q About this shooting, is this the gun that was used? Does it look like the gun?

A Yes sir, it does.

Q Do you know how many shots it holds?

A I think six.

Q Tell me something. Was it fully loaded when you walked in the store?

A Yes sir, it was.

Q There was nine people in there. Right?

A I don't know the exact number.

Q Was there more than six?

A Yes sir.

Q The gun was fired six times, wasn't it?

A Yes sir.

Q Then what happened?

A It was reloaded. *We reloaded it.*

Q It was reloaded and shot again?

A Yes sir. (Tr. T. 214–15.)

The proof of petitioner's guilt is overwhelming and uncontroverted. He was identified as one of the robbers by *three* of the survivors (Tr. T. 155, 203, 222, 224). The stolen vehicle occupied by petitioner was stopped in Memphis after a chase by police. Petitioner and Gooch were apprehended after they fled on foot. In the car was a bank bag and a stereo set taken in the robbery (Trial Tr. 166). As stated above, petitioner was wearing the rape victim's wedding ring and there is significant testimony connecting him with the pistol from which the fatal shots were fired. As a matter of fact, the petitioner admitted both in a signed statement (Tr. T. 248) and in testimony from the stand that he was guilty of all the factual allegations charged by the State, except for firing the fatal shots. A review of the trial record discloses that there is substantial evidence in the record from which the jury could have inferred that petitioner participated in the shooting and also in the rape of the clerk,

although he was not indicted or tried for the latter crime.

## LEGAL PROCEEDINGS

Petitioner was charged by information with murder in the first degree, a capital felony (Ark.Stat.Ann. § 41–2205) on November 10, 1975 in Arkansas County in that he "did unlawfully and feloniously murder Wesley Noble during the perpetration of a robbery." On December 20, 1975 the Prosecuting Attorney was permitted to amend the information to charge "the crime of Capital Felony Murder (Ark.Stat.Ann. § 41–4702) . . . that the said defendant . . . did unlawfully and feloniously murder Wesley Noble during the perpetration of a robbery. . . ." No objection was made to this amendment. The attorney for Sherwood Vincent Gooch moved for a change of venue. Willis Plant, petitioner's appointed counsel, adopted this motion and the trial judge granted both defendants a change of venue out of Arkansas County—Gooch to the Northern District of Prairie County and Pickens to the Southern District of Prairie County. On February 3, 1976 the petitioner was afforded a *Denno* hearing (*Leyra v. Denno*, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954)) in which the voluntary nature of his statement was explored, as well as the propriety of the police lineup where he was identified. In conformity with *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) and subsequent Supreme Court death penalty cases, petitioner was afforded a bifurcated trial—the first phase dealing with guilt and the second phase with penalty. These proceedings were conducted on February 4 and 5, 1976. The jury found petitioner guilty and fixed his punishment at death by electrocution. Judgment was pronounced in accordance with the jury verdict. A motion for a new trial was filed and denied in the trial court, and petitioner's appointed counsel then filed an appeal to the Supreme Court of Arkansas. The conviction and sentence were affirmed. *Pickens v. State*, 261 Ark. 756, 551 S.W.2d 212 (1977). The Supreme Court denied petition for certiorari, *Pickens v. Arkansas*, 435 U.S. 909, 98 S.Ct. 1459, 55 L.Ed.2d 500 (1978). Petitioner filed a *pro se* petition for a copy of the trial transcript which was denied because it was not attached to a petition for post conviction relief, but "petitioner may reapply . . . upon the filing of a petition for post conviction relief. See *Chavez v. Sigler*, 438 F.2d 890 (8th Cir. 1971)." *Pickens v. State*, 266 Ark. 486, 586 S.W.2d 1 (1979). On September 2, 1980 petitioner filed a petition for permission to proceed under Arkansas Criminal Procedure Rule 37 for post conviction relief. Rule 37 affords relief when a sentence is imposed in violation of the Constitution or laws of the United States or this State or "is otherwise subject to collateral attack." This petition which raised many of the same issues now raised in the instant habeas petition was denied in a per curiam opinion on November 3, 1981. The habeas corpus petition in the U. S. District Court was filed on May 14, 1981. Counsel was appointed for petitioner, and his execution was stayed for ninety days on May 20, 1981. The stay was subsequently extended until further order of this Court. A two-day hearing was held on the petition on April 5 and 6, 1982. Petitioner raises twenty points in his habeas corpus petition. These will be discussed *seriatim* and assigned headings and Roman numerals as they appear in his petition.

## I

### PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.

Petitioner devoted most of the hearing and a substantial part of his brief to this issue. Mr. Willis Plant, who was appointed to represent petitioner, is a 1935 graduate of the University of Arkansas School of Law. He entered the Air Force during World War II and chose to remain until retirement as a Colonel in the U. S. Air Force. He then returned to his home community and resumed the practice of law. He and the trial judge, Hon. W. M. Lee, were high school and law school classmates. Judge Lee considered him an excellent trial lawyer who had a lot of native intelligence

and knew people and knew psychology (Ha. T. 316). With reference to his experience, Judge Lee testified:

> Well, he handled a lot of defense, a lot of criminal cases. I appointed him to a lot of criminal cases because he was good. And then, too, lack of lawyers. I'd run out of them. I'd try to spread it around to all the lawyers, but Willis, I guess, represented 75 percent of the criminals in Monroe County. (Ha. T. 317)

Plant had been counsel in a lot of murder cases (Ha. T. 318). Judge Lee further testified:

> Q Judge, do you see any prejudice on the question of guilt to Mr. Pickens by any acts or omissions on Mr. Plant's part?
>
> A None whatever.
>
> Q If you had not been satisfied with Mr. Plant's representation of Pickens, would you have taken some action?
>
> A Yes, I would have if I thought that he was laying down on the job or if I had thought that he wasn't doing what he was supposed to do. (Ha. T. 322)

The Prosecutor described him as a worthy adversary and a "cunning, foxy trial lawyer" (Ha. T. 297) who was "as effective as anybody I ever ran against with a jury" (Ha. T. 298).

Most of petitioner's evidence at the habeas hearing was focused toward a highly critical appraisal of the defense provided by Mr. Plant. Unfortunately, we do not have the benefit of Mr. Plant's explanation and justification of his actions. He has suffered a severe stroke and is totally disabled, mentally and physically. The courts have recognized that it is easy to criticize any lawyer's performance long after the fact and with the benefit of hindsight. The Court of Appeals of this Circuit has recently emphasized the guidelines to be used in testing whether counsel's performance was so ineffective as to deprive petitioner of Sixth and Fourteenth Amendment rights. *Eldridge v. Atkins*, 665 F.2d 228 (8th Cir. 1981) and *Hinkle v. Scurr*, 677 F.2d 667 (8th Cir. 1982). "The exercise of reasonable professional judgment, 'even when hindsight reveals a mistake in that judgment, does not render a lawyer ... lacking in competence in rendering his services.' There is a presumption that counsel has rendered effective assistance. To overcome the presumption, [the petitioner] 'must shoulder a heavy burden.'" *United States v. Blue Thunder*, 604 F.2d 550, 554 (8th Cir., cert. denied, 444 U.S. 902, 100 S.Ct. 215, 62 L.Ed.2d 139 (1979) (citations omitted). Petitioner must show "that his attorney failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances and that he was prejudiced thereby." *Drake v. Wyrick*, 640 F.2d 912, 914 (8th Cir. 1981) quoting *U. S. v. Hood*, 593 F.2d 293, 297 (8th Cir. 1979). *See also United States v. McMillan*, 606 F.2d 245, 247 (8th Cir. 1979) and *United States v. Easter*, 539 F.2d 663 (8th Cir. 1976).

Petitioner primarily relies on counsel's failure to interview potential witnesses with respect to the sentencing phase of the trial as evidencing inadequate trial preparation. This question has been addressed by the Court of Appeals of this Circuit on a number of occasions, *e.g., Plant v. Wyrick*, 636 F.2d 188 (8th Cir. 1980); *Word v. United States*, 604 F.2d 1127, 1130 (8th Cir. 1979); *Benson v. United States*, 552 F.2d 223 (8th Cir. 1977); and *Beran v. United States*, 580 F.2d 324 (8th Cir. 1978). "He apparently did not interview government witnesses or witnesses suggested by his clients.... We note, however, that counsel had full access to government files.... Counsel effectively cross-examined government witnesses.... But assuming that the lack of further investigation here was a breach of duty, petitioners must still show that some prejudice flowed from the breach. They must demonstrate '*the existence of admissible evidence which could have been uncovered by reasonable investigation and which would have proved helpful to the defendant* ....' *McQueen v. Swenson*, 498 F.2d 207, 220 (8th Cir. 1974)." 580 F.2d, at 327 (emphasis added).

There is a great divergence in the various Circuits in the formulation of the tests for

ineffectiveness of counsel. We have already alluded to the test in this Circuit. Three Circuits adhere to the "farce and mockery" standard.[2] The Third Circuit standard is similar to the Eighth[3], as is the test applied by the Seventh Circuit,[4] the Fifth,[5] the Sixth,[6] and Ninth.[7] "In the last analysis all the circuits recognize that the performance of counsel must fall below a minimum, not just an abstract 'norm.' These must be 'serious derelictions.' *Cooper v. Fitzharris*, 586 F.2d 1325, 1330 quoting *McMann v. Richardson*, 397 U.S. 759, 774, 90 S.Ct. 1441, 1450, 25 L.Ed.2d 763 (1970)." *United States v. DeCoster*, 624 F.2d 196, 205 (D.C.Cir. *en banc* 1979) *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979).

The latter case is one of the leading decisions on the issue at hand. We have dealt with the standards for the performance of counsel in the various Circuits. But there is a second criterion by which we must test a Sixth Amendment right to effective counsel. As noted, *supra*, the Eighth Circuit test is that counsel "failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances *and that he was prejudiced thereby.*"[8] What is the nature of this prejudice? There are conflicting views. One is explicated in *United States v. DeCoster, supra,* citing the Eighth Circuit case of *McQueen v. Swenson,* 498 F.2d 207, 220 (8th Cir. 1974), *on remand,* 560 F.2d 959 (8th Cir. 1977): "The claimed inadequacy must be a serious incompetency that falls measurably below the performance ordinarily expected of fallible lawyers. And the accused must bear the initial burden of demonstrating *a likelihood that counsel's inadequacy affected the outcome of the trial.* Once the appellant has made this initial showing, the burden passes to the government and the conviction cannot survive unless the government demonstrates that it is not tainted by the deficiency, and that in fact no prejudice resulted." 624 F.2d at 208.

In *McQueen v. Swenson, supra,* Judge Bright adopted the reasoning of the Third Circuit in *Green v. Rundle,* 434 F.2d 1112 (3d Cir. 1970). "We ought not to intervene in the criminal process unless and until it can be shown that the alleged error itself prejudiced the petitioner in obtaining a fair trial." *Id.,* at 220. Does this mean, as the District of Columbia circuit holds in *United States v. DeCoster, supra,* that the ineffectiveness of counsel must affect the outcome

2. *Gillihan v. Rodriguez*, 551 F.2d 1182, 1187 (10th Cir. 1977), *cert. denied*, 434 U.S. 845, 98 S.Ct. 148, 54 L.Ed.2d 111 (1977); *Rickenbacker v. Warden*, 550 F.2d 62 (2d Cir. 1976), *cert. denied*, 434 U.S. 826, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977); *United States v. Madrid Ramirez*, 535 F.2d 125, 129 (1st Cir. 1976).

3. *Moore v. United States*, 432 F.2d 730, 736 (3rd Cir. 1970) ("normal competency: the exercise of customary skill and knowledge which normally prevails at the time and place")

4. *United States ex rel Williams v. Twomey*, 510 F.2d 634, 640 (7th Cir. 1975) (defendant is entitled to assistance of counsel that meets a "minimum professional standard").

5. *McKenna v. Ellis*, 280 F.2d 592, 599 (5th Cir. 1960) ("counsel reasonably likely to render and rendering reasonably effective assistance"). See also *Washington v. Strickland*, 673 F.2d 879 (5th Cir. 1982).

6. This Circuit has adopted the same test as the Sixth. *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974).

7. *Cooper v. Fitzharris*, 586 F.2d 1325, 1330 (9th Cir. 1978) ("reasonably competent attorney acting as a diligent, conscientious advocate").

8. "Evaluation of a habeas corpus petition alleging ineffective assistance of counsel is a two-step process: first, determining, as we have already done, whether there has been a failure to perform some duty, as essential as the duty of investigation, owed by a defense attorney to his client; and second, determining, as will be done on remand, whether that failure prejudiced his defense. This second step is necessary, we believe because the failure to investigate—though a constitutional error—might in certain circumstances be a 'harmless' one and hence would not justify habeas corpus relief. We are guided in this regard by *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), where the Court fashioned its harmless-constitutional-error rule." *McQueen v. Swenson*, 498 F.2d 207, 218 (8th Cir. 1974).

of the trial? Another view is adopted by a panel of the Fifth Circuit (Roney, J., dissenting). *Washington v. Strickland,* 673 F.2d 879 (5th Cir. 1982). A majority of the panel held that the prejudice requirement is satisfied by demonstrating that but for counsel's ineffectiveness petitioner's trial, *but not necessarily its outcome would have been altered in a way helpful to him.*

The majority in *Washington v. Strickland, supra,* points out that the Eighth Circuit has consistently adhered to the standard enunciated in *McQueen v. Swenson, supra.*[9] The Supreme Court recently commented that "certain violations of the right to counsel may be disregarded as harmless error .... The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense." *United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981).

What if counsel's inadequacies have risen to the level of constitutional ineffective assistance of counsel and it has been established that defendant was prejudiced thereby? *Washington v. Strickland, supra* holds that the state can still avoid a grant of habeas relief by demonstrating that counsel's ineffectiveness was harmless *beyond a reasonable doubt.* In so holding the court stated that it joins the Third and Eighth Circuit, referring to a footnote where *McQueen v. Swenson, supra* is discussed at length. 673 F.2d at 902, n. 27.

In the light of these well-established principles, we must examine the performance of Mr. Plant. First of all, it must be recognized that he was faced with an extremely difficult task in preparing a defense of

Pickens. Pickens had voluntarily signed a statement admitting all facts pertinent to the state's case except that he had fired the fatal shots. Pickens was identified by surviving victims. The implicated firearm was traced to him, and he was wearing the wedding ring of a woman who was not only raped but shot in the robbery. To defend this case could well have caused the late Clarence Darrow to throw up his hands in frustration. "When ... the prosecution has an overwhelming case based on documents and the testimony of disinterested witnesses, there is not too much the best defense attorney can do." *United States v. Katz,* 425 F.2d 928, 930 (2d Cir. 1970). Nevertheless, Mr. Plant secured a change of venue for his client and obtained a very comprehensive response to a bill of particulars. In this response Plant obtained the statements taken from all the defendants and all witnesses interviewed by the police, all the forms signed by the defendants, ballistics tests, crime scene diagrams and search descriptions, a list of all physical evidence which the State planned to introduce along with a list of all the State's witnesses and a summary of the testimony. A pre-trial *Denno* hearing was held. Petitioner's witnesses were critical because this hearing was held at the instance of the Prosecutors. The Prosecuting Attorney advanced a plausible reason why Plant did not request a *Denno* hearing before the State made such a request (Ha. T. 299). Be that as it may, petitioner did receive a comprehensive *Denno* hearing which clearly indicated that his written statement was voluntarily given after he was fully advised of his rights. No prejudice resulted to petitioner because the *Denno* hearing was requested by the State. "It is all well and

---

9. At 673 F.2d 897, n. 12 the following examples are given. *See, e.g., Ford v. Parratt,* 638 F.2d 1115, 1118 (8th Cir. 1981) (when defendant enters a guilty plea, prejudice inquiry necessarily centers upon whether counsel's failure to investigate prejudiced defendant's ability to make an intelligent and voluntary guilty plea); *Morrow v. Parratt,* 574 F.2d 411, 413–14 (8th Cir. 1978) (petitioner prejudiced by counsel's failure to interview eyewitnesses because the evidence counsel would have discovered there-

by "may have completely changed the defense strategy"); *Harshaw v. United States,* 542 F.2d 455, 456–57 (8th Cir. 1976) (petitioner failed to establish he was prejudiced by counsel's failure to conduct a pretrial investigation when record reflected "no allegation of anything such investigation might have been expected to produce and no indication of how its omission, if it occurred, was derelict and prejudicial"; neither was there prejudice from counsel's failure to make frivolous objections).

**594**

good for a millionaire to retain counsel with the instruction to 'leave not the smallest stone unturned.' But it goes too far to insist that such a course is a general constitutional mandate." *United States v. DeCoster, supra,* at 210.

From the trial transcript, it is obvious that Plant's defense was concentrated on an attempt to prove his client did not fire the fatal shots. It is hard to fault this strategy. One wonders what other defense could have been advanced in the face of the State's overwhelming case. In the context of this defense, the examination and cross-examination of the witnesses was pointed and skillful. The brevity of Plant's questions is commendable. It is the inexperienced advocate who cross-examines too much. One of petitioner's own witnesses testified as follows:

Q I'd like to just sum up a little bit now. With regard to the guilt stage and the pretrial stage, do you feel that Plant was adequately prepared through investigation to effectively present the defense?

A My problem with that is that I don't know that there was much of a defense to present. I remember being surprised by the fact that he did hammer upon, in cross examination and otherwise, the only key issues that I felt like he had available to hammer upon. I don't think he did a poor job at all with respect to the actual trial, guilt stage trial of the cause. (Isbell Dep. 72.)

█ Plant is criticized because he failed to file motions in the trial court concerning the constitutionality of the Arkansas death penalty statute. Assuming that Plant should have filed such motions, how was petitioner prejudiced? The issue as to the constitutionality of the Arkansas Death Penalty statute was raised in the Arkansas Supreme Court by Plant. The court fully considered this contention citing a number of cases where statutes textually similar to the Arkansas enactment had been upheld by the Supreme Court of the United States. *Pickens v. State,* 261 Ark. 756, 551 S.W.2d

212, 214 (1977). Surely the constitutionality of the Arkansas statute was raised in petitioner's petition for certiorari filed in the Supreme Court of the United States, for Justices Brennan and Marshall dissented in these words: "Adhering to our views that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg v. Georgia,* 428 U.S. 153, 227, 231, 96 S.Ct. 2909, 2950, 2973, 49 L.Ed.2d 859 (1976), we would grant certiorari and vacate the death sentence in this case." 435 U.S. 909, 98 S.Ct. 1459, 55 L.Ed.2d 500 (1978).

█ Clearly petitioner's attack on the constitutionality of the death penalty statutes has been preserved at all stages of appellate review and is being mounted again in this very proceeding. Because Plant did not file in the trial court motions raising constitutional issues, petitioner concludes that Plant did not research the law or read the pertinent cases. There is not one iota of proof in this respect except some vague statements that Plant was not a "book lawyer" or "legal technician." One would not have to be either to properly research the law governing a capital case in late 1975. *Furman v. Georgia, supra* was less than four years old. The pertinent decisions were few in number. Surely they could be understood by the graduate of an accredited law school, a retired Air Force Colonel, and an experienced criminal lawyer. He is charged with not having interviewed the State's witnesses, although proof in this regard is utterly lacking and the Prosecuting Attorney testified as follows:

Q Did Mr. Plant ever talk to you about contacting any of the state's witnesses in this case?

A Well, one time he called me and said that he had contacted—I don't know if he said one or two—one or two witnesses and they were a little bit rude and hostile toward him. He wanted to know if I could aid him in making these people talk to him. (Ha. T. 298.)

Petitioner states in his brief, "There is no indication in the trial record or evidence presented at the habeas hearing that Plant ever interviewed these officers." (Pet. Brief p. 24). There is little indication that he did not and some indication from the above testimony of the Prosecutor that he did. There was a stipulation that he did not interview Sheriff Garrison (Jt.Ex. 11). However, an examination of Garrison's testimony shows it to be cumulative and inconsequential. His testimony is listed in the Bill of Particulars with two others (Tr. T. 36). He was not a major figure in the investigation or the apprehension of petitioner. We fail to see how the failure to interview Garrison prejudiced petitioner. Herein lies the weakness of petitioner's argument on this point. Petitioner has to prove affirmatively that Plant neglected some duty to his client. Speculation and assumption is no substitute for proof. There is a presumption counsel has rendered effective assistance. *Thomas v. Wyrick*, 535 F.2d 407, 413 (8th Cir. 1976), *cert. denied* 429 U.S. 868, 97 S.Ct. 178, 50 L.Ed.2d 148 (1976). The burden of proof does not rest upon the state.

The real issue in this case is whether petitioner received effective assistance of counsel in the sentencing phase of the case. "In capital cases, counsel's preparation for the sentencing as well as the guilt phase of the prosecution is especially important because of the nature and purpose of the distinctive sentencing procedure used in capital cases." *Washington v. Strickland, supra* at 892. Most of petitioner's evidence and argument has been directed toward this question. In a nutshell, petitioner argues that evidence should have been presented concerning his background and his cooperation with the authorities in the apprehension of Antonio Clark, and that Plant was derelict in his duty in not investigating Pickens' background in Louisiana and Detroit, Michigan. Admittedly, Plant presented no evidence in the sentencing phase of the trial. Was the failure a result of dereliction of duty or was it simply trial strategy? "Condemning the inevitable and understandable tendencies to the contrary our cases uniformly command that counsel's effectiveness may not be assessed through the finely ground lenses of 20/20 hindsight—and this command is especially compelling in reviewing claims of ineffective assistance that are grounded in allegations of inadequate investigation and preparation." *Washington v. Watkins*, 655 F.2d 1346, 1356, *Reh. denied* 662 F.2d 1116 (5th Cir. 1981).

At the habeas hearing Pickens' mother testified extensively concerning his background (Ha. T. 9–56). Her testimony may be briefly summarized as follows. Petitioner was abused by his father, who was similarly abusive to her and other members of the family. When petitioner was five years old, she left their home in Louisiana taking two of the younger children and moved to Detroit. Petitioner and three of the other children remained with the father and one went to live with other relatives in Louisiana. She would visit Louisiana once a year for about a week. Through members of the family, she learned that her husband continued to abuse petitioner and that he had run away on several occasions. As a result of breaking into a store and stealing a purse, he had been sent to a reformatory in Louisiana. She visited with the juvenile judge who encouraged her to take the petitioner, then fifteen years of age and confined in a reformatory, to live with her in Detroit. He was mistreated by neighborhood boys there and was shot when he was age 16. He began associating with street gangs and eventually became involved in a robbery to which he pled guilty and received a sentence of 3½–15 years. In the Michigan penitentiary he met Antonio Clark, a co-defendant in the Casscoe murders. Mrs. Pickens described Clark as a drug pusher and "gangster" type who exerted considerable domination and influence over her son. She tried to dissuade the latter from associating with Clark after his release from prison in 1975 because this was a violation of his parole. She was unsuccessful in this attempt and Pickens eventually moved out of her house and started living with Clark in his apartment. She

reported these facts to her son's parole officer. Shortly before going to Arkansas, Pickens had completed the Chrysler training school and was actually offered a job with Chrysler after his arrest in Arkansas. She further testified that after Clark escaped the police dragnet and came to Detroit "he called me and told me that there had been a robbery and that some people were killed .... He said he had a .38 and when he went in he said it was loaded; he said he emptied his gun into some people, and then he reloaded it and shot some more." (I do not credit the latter part of this testimony. It is inconceivable that a man on the run would have made such an admission to a woman who strongly disapproved of him. Furthermore, the pistol was a .22 which was admittedly in possession of Pickens when they entered the store.) As a result of Clark's call, she let the FBI tap her phone to try to locate him. She testified that she and Pickens corresponded about her cooperation with the FBI and he encouraged it. She testified that she called Plant on several occasions but that he did not return her calls. She went to the trial accompanied by one of her daughters, but Plant never did sit down with her and talk about the nature of the trial. At her son's trial she would have presented the same evidence that she presented in the habeas hearing.

Petitioner asserts that Plant was derelict in not uncovering this background by a thorough investigation in Louisiana and in Detroit. There is, however, no proof that Plant was unaware of this background or that he did not make an investigation of petitioner's background. That he did not do so is pure speculation. Because of petitioner's long involvement with criminal law enforcement, many sources were available as to petitioner's background. The mere fact that Plant did not contact some individuals about petitioner's family history does not mean that he did not contact others or that he was not fully conversant with petitioner's background.

This brings us to the real question in the case. Would exposure of this background to the jury have helped or hurt the petitioner in the penalty phase of the case? A convincing argument can be made that to bring out such a bad record of law violation would have been the worst trial strategy imaginable. Plant would have been subject to as much or more criticism if this testimony were placed before the jury. The trial judge thought this testimony as to petitioner's background, which he heard completely in the habeas hearing, would have had no effect on the jury's sentence:

Q Judge, I have to ask you the same question that each witness has been asked to answer. Do you think the background information regarding Mr. Pickens would have had any effect on the jury's sentence?

A Well, I'll just answer that by asking you a question, Mr. McNair. If you were sitting on a jury and you had testimony pretty well introduced that shows the man is guilty all except he is relying on "I didn't pull the trigger," and then you heard that on—put on somebody to mitigate this thing, the damage is done, and that person says, "Well," says, "he's been a street gang fighter, run around on the Detroit streets. He was in reform school at the age of 15 for stealing a purse. Then he was convicted of robbery, armed or unarmed—that doesn't matter—and was out on probation. While he was out on probation he got involved in this." I think all that would have done for me as a juror or you as a juror would be to confirm the fact that he did do these bad things. In other words, he was no good to begin with and then it got worse. (Ha. T. 324–25.)

Petitioner's principal witness was Millard Farmer, an Atlanta attorney associated with the Team Defense Project, which is engaged in assisting persons being tried for or who have been convicted of capital offenses. Mr. Farmer was brought into the case as an expert witness by petitioner's appointed counsel. His chief criticism of the defense was the failure to present evidence in the second stage of the trial (Ha.

T. 59). With regard to the guilt phase, he stated, "There's no question in my mind that the individual was factually involved in the case." (Ha. T. 60) Farmer made his own investigation of petitioner's background. He talked to the parents (Ha. T. 63) and the sister who had attended the trial (Ha. T. 65). The latter could have testified according to Farmer as to the father's having beat Pickens with a board and also as to Clark's domination of Pickens (Ha. T. 69). He also talked to other siblings (Ha. T. 75, 76). Mr. Farmer's law partner went to Louisiana and obtained affidavits from other family members, the juvenile judge and a welfare case worker. The information obtained by Mr. Farmer's law partner basically covered the same ground as the mother's testimony on her son's life in Louisiana between the ages of five and fifteen. Farmer also talked to the lawyer who represented Pickens on the robbery charge in Detroit. In his opinion, this lawyer could have been of great assistance in the Arkansas trial. (If this lawyer was so anxious to help, one wonders why some member of the family in Detroit did not seek his help.) Farmer also interviewed a number of other individuals who were acquainted with Pickens and could have testified as to his background (Ha. T. 84–92). I am not impressed with the contribution these people could have made by giving testimony in the penalty phase of the case. Pickens was in Detroit five years. From August, 1972 until early in 1975 Pickens was either in jail or the Michigan Penitentiary on a robbery sentence. After his release, by his mother's admission he was in continual violation of his parole by moving in with another parolee and drug pusher, Antonio Clark. This association began in prison and was reestablished one month and a half after Pickens was released (Ha. T. 36). It continued until the crime charged herein was committed. Thus from August, 1972 to the time of this crime, Pickens was either in prison or was running with and living with an ex-convict parolee and drug pusher whom Pickens' mother described as a "gangster" type. It seems to me that the State would have welcomed the exploration of petitioner's Detroit background. Clearly, Plant cannot be faulted for deciding not to open such a dangerous corridor. The comments of a Fifth Circuit panel are appropriate:

> Complaints concerning uncalled witnesses impose a heavy showing since the presentation of testimonial evidence is a matter of trial strategy and often allegations of what a witness would have testified to are largely speculative. *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978). None of the alleged witnesses were called at the § 2255 hearing and no one knows what they would have testified to. All we have is what Guerra says they would have said.

*United States v. Guerra*, 628 F.2d 410, 413 (1980).

■ Farmer was also critical of Plant for not having obtained the services of a psychiatrist or psychologist in this case. It must be observed that nowhere in this record or the trial record is there any indication that petitioner was suffering from any mental or emotional aberration. His mother testified that he did all right in school (Ha. T. 29). After release from prison he completed the three and one-half months Chrysler training course so satisfactorily that he was offered a job (Ha. T. 39). He testified cogently and clearly in his own defense at the trial. The use of a psychiatrist or psychologist in a case of this type is always a matter of trial strategy. Defense counsel must decide who is likely to win the battle of the experts. If the defense had introduced psychiatric or psychological testimony in this case, the State would undoubtedly have countered with its experts. Mr. Plant may well have decided that his client, in view of his past history, would not profit from an exploration of this avenue.

Petitioner places much reliance on the recent Supreme Court case of *Eddings v. Oklahoma*, —— U.S. ——, 102 S.Ct. 869, 71 L.Ed.2d 1, a case decided on certiorari to the Court of Criminal Appeals of Oklahoma. The 16-year-old defendant was given a death sentence for killing a police officer. In the sentencing phase of the trial, which

598

was conducted before the court and not the jury as in the case at bar, Eddings presented substantial evidence of his troubled youth:

> The testimony of his supervising Juvenile Officer indicated that Eddings had been raised without proper guidance. His parents were divorced when he was 5 years old, and until he was 14 Eddings lived with his mother without rules or supervision. App. 109. There is the suggestion that Eddings' mother was an alcoholic and possibly a prostitute. App. 110–111. By the time Eddings was 14 he no longer could be controlled, and his mother sent him to live with his father. But neither could the father control the boy. Attempts to reason and talk gave way to physical punishment. The Juvenile Officer testified that Eddings was frightened and bitter, that his father overreacted and used excessive physical punishment: "Mr. Eddings found the only thing that he thought was effectful with the boy was actual punishment, or physical violence—hitting with a strap or something like this." App. 121.
>
> Testimony from other witnesses indicated that Eddings was emotionally disturbed in general and at the time of the crime, and that his mental and emotional development were at a level several years before his age. (At ——–——, 102 S.Ct. at 872)

The trial court considered Eddings' age as a mitigating factor but held *as a matter of law* that "he could not consider in mitigation the circumstances of Eddings' unhappy upbringing and emotional disturbance." The Court of Criminal Appeals affirmed. The Supreme Court in a 5–4 decision reversed. Justice Powell wrote:

> We find that the limitations placed by these courts upon the mitigating evidence they would consider violated the rule in *Lockett*. Just as the state may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer, refuse to consider, *as a matter of law,* any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to

disregard the mitigating evidence Eddings proffered on his behalf. The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.

> Nor do we doubt that the evidence Eddings offered was relevant mitigating evidence. Eddings was a youth of 16 years at the time of the murder. Evidence of a difficult family history and of emotional disturbances is typically introduced by defendants in mitigation. See *McGautha v. California*, 402 U.S. 183, 187–188 and 193, 91 S.Ct. 1454, 1457, and 1460, 28 L.Ed.2d 711 (1971). In some cases, such evidence properly may be given little weight. But when the defendant was 16 years old at the time of the offense there can be no doubt that evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant. At ——–——, 102 S.Ct. at 875–876.

There are significant differences between *Eddings* and the case at bar. *Eddings* was decided by the Supreme Court on a petition for certiorari. Here such a petition was denied and we deal with a collateral attack by habeas corpus. Eddings was 16 years of age at the time of the crime; Pickens was 21. There was evidence that Eddings was retarded in intelligence and emotionally disturbed; no such evidence appears in the record of the case at bar. The cases are parallel in that in both cases the defendants had been subject to beatings by a harsh father and in both the family history was turbulent.

■ The admissibility and relevance of this testimony is not at issue in the case at bar. If Mr. Plant had chosen to open up petitioner's family history, doubtless the jury could have considered the abusive treatment by the father in mitigation. The problem with presenting this testimony is that it would open up the presentation by

the State of potential testimony in aggravation which could have been much more damaging to petitioner. At least, such is a reasonable explanation of Plant's trial strategy.

In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), on which the majority relied in *Eddings*, the court said:

> We conclude that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Id.* at 604, 98 S.Ct. at 2964 (emphasis in original).

In the case before us, defense counsel chose not to rely on (for what would appear to be good reason) "any aspect of defendant's character or record." He chose instead to rely on "the circumstances of the offense," i.e., that the proof did not establish that his client fired the fatal shots. Even with the benefit of 20/20 hindsight, can it be said that his strategy was faulty?

The Fifth Circuit has recently observed that "failure to conduct exhaustive investigation, to discuss a case at length with a client, or to follow certain trial tactics is not necessarily a ground for reversal." *Baty v. Balkcom*, 661 F.2d 391, 395, N. 8 (5th Cir. 1981). In support the Court noted that tactical decisions of counsel are not an indication of ineffective assistance of counsel even though in retrospect they are clearly wrong.[10] Shortness of time with a client[11] or meeting with a client only once prior to trial is not indicative of ineffective assistance, and the Court will not with aid of hindsight, inquire into counsel's trial tactics.[12] Counsel need only conduct an investigation to the extent necessary.[13] "Appellant complains that his counsel failed to investigate the background of a key prosecution witness and his role in the conspiracy and was therefore unable to impeach his damaging testimony effectively. But a defendant is not entitled to errorless counsel, nor counsel ineffective only in hindsight. Moreover, the evidence of guilt against appellant was overwhelming."[14]

Apparently, the trial tactic of Mr. Plant was not to open up the full panorama of Pickens' background by the introduction of evidence but simply to argue any favorable aspects of his background in mitigation. Mr. Isbell, whose deposition was taken at the instance of petitioner, testified as follows on direct examination:

Q In your opinion, did Mr. Plant pull any stops?

A I remember bits and pieces of the argument that he made to the jury after the mitigating thing, and at that point in time, he did considerably more in the way of argument than he did in the way of presenting evidence that is not reflected by the record. I have memory of his introducing the mother and the other family members of the defendant that were there in the courtroom attending. I remember arguments about what kind of man Tony Clark was. I remember lots of things being argued that had not been presented in the way of testimony. (Isbell Dept. 49.)

He gave the following testimony on cross examination:

Q Mr. Plant did argue at the mitigation stage of Mr. Pickens' hearing?

A Yes, he did.

Q Do you consider that he was effective in his argument?

---

**10.** *Beckham v. Wainwright*, 639 F.2d 262 (5th Cir. 1981).

**11.** *Easter v. Estelle*, 609 F.2d 756 (5th Cir. 1980).

**12.** *Jones v. Estelle*, 622 F.2d 124 (5th Cir. 1980), *cert. denied* 449 U.S. 996, 101 S.Ct. 537, 66 L.Ed.2d 295 (1981).

**13.** *Wilkerson v. United States*, 591 F.2d 1046 (5th Cir. 1979).

**14.** *Id.* at 1047.

A At that point in time, I felt like he took whatever shot he had available to him. I remember him introducing or pointing out Mr. Pickens' mother and seems like sisters or some other kinfolk. There was quite a contingent of family there, and I remember him pointing them out sitting in the courtroom. I remember the mother very distinctly. I remember him arguing about what kind of person Tony Clark was and that he was the one that did all of these things. I remember him arguing about the youthfulness of Mr. Pickens; that he was not much more than a teenager—if I recall the terms correctly. I remember a lot of things being said in argument at the sentencing, but I don't remember witnesses testifying.

Q And you're sure that Mr. Pickens' family was there?

A Yes, I am. I am sure that I had the impression that they were Mr. Pickens' family; that his mother and some young girls that I took to be sisters or nieces or something, yes, I am sure there was family there.

Q The mitigating circumstance of being under the domination of another when the killing took place—which was referred to earlier—in your interpretation, does that—is that more appropriate when the person alleging domination did the murder or is it—does it just apply to someone that's just simply standing by?

A No, I think at mitigation you use it whichever way you think you can use it. I didn't feel like it was a very realistic defense in this particular case on the basis of the direct and cross examination of the defendant when he made statements to the effect that he was good friends with the other defendants, especially a good friend of Tony Clark and that they had done other criminal acts together and had come all that way from Michigan down here together. It would have been very difficult to have made a very meaningful argument about domination under those kinds of circumstances because of, you know, the opportunity to get away from that domination, the opportunity to have escaped, to have fled, to have renounced any participation. We were talking about a very, seemingly lengthy period of time in which they were active cohorts, and it would have been very difficult, I felt, to have made a very meaningful argument about domination under those circumstances. (Isbell Dep. 87–89.)

and on redirect testified:

Q I've just got a few more questions. You have tried a lot of cases and made a lot of arguments to a jury. Is it your opinion that if you're going to argue a matter to a jury that it's best to provide them with a factual basis for the argument?

A Most of the time.

Q Would you say that would hold true in the case of the sentencing phase of a capital trial?

A As a general rule, I would agree with that proposition. I have seen a great deal done in statements or in argument without facts to support them that was probably done—probably better done without the facts in evidence than they would have been done with them. I think as a general rule, yes, that you ought to have and should have and the law requires that you have facts in the case to support your argument and that that is a meaningful way of making an argument is by illustrating the facts, yes. But, I have also seen the other done, which is to argue most vehemently and sometimes very successfully without having put on evidence to support the argument you're making.

Q Based upon this record, do you think any argument as to sentencing on behalf of the defendant would have been better served by the presentation of evidence prior to that argument?

A I don't know. That's a decision as to the credibility of witnesses and as to the nature of inquiry that could have been fruitful that I can't pretend to second guess. I don't know whether it would have been beneficial to put on his mother or his sisters or reverends or preachers or friends or anything else. They would have had a difficult—if not impossible—time of overcoming the impact of the testimony in the case in chief as to his involvement and to his culpability. I don't know the answer to that.

Q It possibly would have been beneficial?

A Sure. (Isbell Dep. 105–107.)

## II

PETITIONER WAS DENIED DUE PROCESS OF LAW, EQUAL PROTECTION OF THE LAW, AND HIS RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS, AS WELL AS ARKANSAS LAW, TO A MEANINGFUL AND RESPONSIBLE REVIEW OF HIS CONVICTION AND SENTENCE DUE TO THE FAILURE OF THE SUPREME COURT OF ARKANSAS TO UNDERTAKE ITS STATUTORY MANDATED REVIEW RESPONSIBILITIES AND DUE TO THE LACK OF A COMPLETE AND ACCURATE TRIAL TRANSCRIPT ON APPEAL.

The trial record in this case does not contain a transcript of the voir dire, opening statements and closing arguments. In both civil and criminal cases it is the practice of state court reporters to make a tape of these parts of the trial. Shorthand notes are generally made only of the trial testimony. If a transcription of other parts of the trial is needed, it is made up from the tapes. In this case the tapes of the voir dire, opening statements and closing arguments were destroyed in a fire which consumed the court reporter's house. The trial transcript (not unlike most trial transcripts) does not contain these items. If counsel felt that error occurred in these aspects of

the trial, he could have supplemented the record and pointed to the specific error. A copy of the transcript was delivered to petitioner's counsel on September 7, 1976. At the time he was "advised that if he could show the court within twelve days wherein any material mistake or objection was made and/or omitted, the transcript would be corrected accordingly" (Tr. T. 62). Counsel had on September 3, 1976 moved for a new trial on the basis of the destruction of the tapes. After expiration of the twelve days noted above, the court denied the motion because there was "no such mistake or omission presented to the court" (Tr. T. 621).

Petitioner argues that the Supreme Court of Arkansas was under the impression that the trial judge had reviewed the record personally and found it to be accurate. 261 Ark. 756, 758–59, 551 S.W.2d 212, 214 (1977). In the habeas hearing Judge Lee testified that he did not review the transcript for accuracy (Ha. T. 325). We do not agree with petitioner. In his order denying the motion for a new trial, the court made the following finding:

That from the reporter's shorthand record of the trial proceeding the court reporter has prepared a true and accurate transcription of the trial proceeding herein and certified same in the usual manner and a copy thereof has been filed with the Circuit Court Clerk at DeValls Bluff, Arkansas and also a copy of same has been delivered to the attorney for the defendant on September 7, 1976. That defendant's attorney was advised that if he could show the Court within twelve days wherein any material mistake or objection was made and/or omitted, the transcript would be corrected accordingly. There has been no such mistake or omission presented to the Court. (Tr. T. 62.)

After quoting this finding, the Supreme Court of Arkansas said:

On the basis of the trial court's finding, we must conclude that the motion for new trial was properly overruled. We note that in some instances there are some omissions of isolated words in the

transcript, however, appellant does not contend that the transcript before the Court omits any matters of consequence. 551 S.W.2d at 214.

This statement does not indicate to me that the Supreme Court of Arkansas thought Judge Lee personally reviewed the record for accuracy and "relied heavily upon its understanding." I interpreted Judge Lee's finding to be based on the court reporter's certification plus the failure of defense counsel to object or point out inaccuracies during the time allotted by the court, which seems to be a reasonable time for reviewing a 260-page record.

Petitioner also points out that no hearing was held to settle the record, as requested in defense counsel's motion of September 3, 1976. However, this motion was made before counsel was furnished a copy of the record on September 7, 1976. After receiving the record apparently counsel felt no necessity for a further hearing or further additions or corrections in the record. In fact the Supreme Court of Arkansas states in its first opinion that "appellant does not contend that the transcript before the Court omits any matters of consequence." 261 Ark. 756, 759, 551 S.W.2d 212, 214 (1977).

The omissions from the trial record and failure of counsel to object thereto were again raised in a Rule 37 petition in the Supreme Court of Arkansas. The Supreme Court said in its unpublished opinion of November 3, 1980:

Petitioner's final allegation of ineffectiveness involves the appeal. The tape records of the trial were destroyed by fire and the record had to be reconstructed from the reporter's shorthand notes. Counsel's failure to object to the reconstructed record and its omission of voir dire when given an opportunity allegedly deprived petitioner of a meaningful appellate review. The burden is on petitioner to show error in the reconstructed record and this burden is not met by showing the possibility of error. *Butler v. State*, 264 Ark. 243, 520 [570] S.W.2d 272 (1978). Petitioner has not demonstrated prejudice. At 5–6.

Thus, it is apparent that at no time either in the trial court, the Supreme Court, or indeed in this habeas corpus hearing has petitioner pointed to one specific instance in the opening statement, closing argument, or voir dire wherein some ruling of the trial court prejudiced his case.

Petitioner complains vigorously that the appellate courts did not have the voir dire to review. It is significant that none of the witnesses who testified in the habeas hearing had any specific criticism of the voir dire or recalled anything adverse regarding the manner in which it was conducted. Judge Lee, the trial judge, testified:

Q Judge, did you participate in the voir dire, the jury selection at this hearing?

A I don't recall specifically what I did at it, but I usually did participate in the voir dire, particularly in felony murder cases to be sure that Witherspoon was observed. Now usually I had on my instruction book a little note on the Witherspoon case, and I had it rephrased or paraphrased the two questions that you were supposed to ask in Witherspoon because a lot of the people that are on a jury don't understand what you mean by, "Are you irrevocably committed?" There are a lot of people that don't know what you're talking about when you make a statement like that and they serve on juries. Because the only disqualification for a jury in Arkansas now is to be—having been on a jury before within two years or some mental or physical defect. That is if that was the law when I retired about two and a half or three years ago.

Q Do you have any recollection, Judge, of potential jurors being wrongfully used during the voir dire in Mr. Pickens' case?

A No.

Q Do you think had there been any questionable juror, it would have stood out in your mind?

A Had it been questionable I would have discharged them because I knew it was an important case and I wasn't going to gamble on the jury. I mean, something being wrong with the voir dire. (Ha. T. 320–21.)

With further regard to the mandate of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and whether there was any violation thereof, we note the following testimony by Mr. Baine, the Prosecuting Attorney:

Q Turning to the jury selection process, Mr. Baine, did you actively participate in the voir dire?

A I believe—if I'm not mistaken, I did all the voir dire. I could be wrong.

Q Were you aware of the *Witherspoon* case at the time of the trial?

A Judge Lee made me very aware of it.

Q Prior to this case?

A Yes.

Q Did you conform your questioning to the *Witherspoon* guideline?

A I had it typed out. In fact, my recollection, it was two questions, right? In the *Witherspoon* case there were two questions that you had to ask is my recollection.

Q Are you able to say from your witnessing Mr. Plant's voir dire whether he was aware of the *Witherspoon* issue?

A Well, sure he was. He wanted to get somebody on there that had some doubts about their ability to render a death penalty.

Q Did he ever attempt to rehabilitate any jurors that were going to be excused for their inability to consider the death penalty?

A My recollection is that he did. I don't know how many questions, but I mean my recollection that he was trying to get a couple of people on there that I would have struck anyway. You know, I had some strikes myself.

Q Would Judge Lee ever take part in the voir dire?

A To my recollection he did. He could best answer that but I think that there was some people that—you know, that's a confusing issue, the Witherspoon, and I think Judge—my recollection is that he did take part in it to establish—for them to understand exactly what the questions meant. But he could best answer that. But it's my recollection that he did.

Q In your opinion, was there any *Witherspoon* error in Mr. Pickens' jury selection?

A You mean the people he selected?

Q Do you feel that anyone was wrongfully excluded?

A Well, I don't think so. I never—I wasn't particularly concerned about the voir dire part of the trial after it was over. I mean from an error standpoint. (Ha. T. 301–303.)

Mr. Gary Isbell, an assistant Attorney General and a special prosecutor in the case whose deposition was taken at the instance of petitioner, stated, "I don't remember anything in the jury selection that stood out as a particular—that stood out as any issue that would have been subject to very much review" (Isbell Dep. 60). His memory was that there was compliance with the requirements of *Witherspoon* (*Ibid*). He testified further as follows:

Q Due to the holding of *Witherspoon*, do you feel that to have meaningful appellate review in a capital case that the jury selection proceeding is a critical part of the record to be reviewed?

A As an overall proposition, yes.

Q Can you say that there was no necessity for such review in this case?

A I don't remember the *Witherspoon* issues in this case of having arisen to any particular degree of concern. In fact, I don't remember any concern at all about the *Witherspoon* issues. We felt like we had complied with all of the requirements of *Witherspoon* and the inquiries were sufficiently—the inquiries and the responses were suf-

ficiently black and white that Witherspoon did not strike me as a meaningful source of inquiry in this case. (Isbell Dep. 62.)

Mr. Isbell further testified that he did not think defense counsel had an obligation to have all the voir dire recorded, but only "if you get into a particular line of questioning or you get with jurors that illustrate particular problems, then I certainly think that those issues should be identified for an appellate record" (Isbell Dep. 64).

On cross-examination by the State he testified with regard to the accuracy of the record:

Q And from your reading of the record reconstructed from the court reporter's handwritten notes, there are no significant omissions or errors?

A I remember being surprised by the fact that I did not identify any significant—I don't remember identifying any issues that weren't in the reconstructed record, but I remember being surprised by the fact that it seemed like such a complete record. I don't remember anything that struck my fancy that there was anything amiss with it; anything left out. (Isbell T. 92.)

### III

PETITIONER WAS DENIED DUE PROCESS OF LAW BY THE AFFIRMANCE OF HIS CONVICTION AND SENTENCE OF DEATH WHERE THE JURY MADE TOTALLY INCONSISTENT FINDINGS WITH REGARD TO AN ESSENTIAL ELEMENT OF THE CRIME CHARGED.

This contention was abandoned since evidence adduced at the habeas hearing verified that the jury was told specifically by the State not to consider as an aggravating circumstance that the murders were committed for pecuniary gain. The State felt that the wording of the statute might refer to a "hit man" killing or a murder for hire. They did not want to take a chance of error in this respect and told the jury to answer this question in the negative. The jury did so finding specifically that the capital felony was not committed for pecuniary gain (Tr. T. 44).

### IV

PETITIONER WAS DENIED HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO AN IMPARTIAL JURY BY THE WRONGFUL EXCLUSION FOR CAUSE OF PROSPECTIVE JURORS WHO WERE NOT UNEQUIVOCALLY OPPOSED TO CONSIDERING THE IMPOSITION OF THE DEATH PENALTY.

In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court established that the Sixth Amendment guarantee of an impartial jury, applicable to the States through the Fourteenth Amendment, prohibits a State from excusing for cause in a capital case prospective jurors who express general objections to capital punishment. The standard is clear and strict: in a capital case, only prospective jurors who make "unmistakably clear" (1) that they would "automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at trial ... or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt" may be excused for cause. *Witherspoon v. Illinois, supra*, at 522–523 n.21, 88 S.Ct. at 1776–1777 n.21. Exclusion of a single venireman on any broader basis precludes carrying out the sentence of death. *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).

Petitioner's argument has been discussed under II, *supra*. There is not one iota of evidence that *Witherspoon* error was committed in the trial of this cause. In fact all the evidence adduced at the habeas hearing indicated there was no *Witherspoon* error. The Supreme Court of Arkansas in its unpublished per curiam opinion of November 3, 1980 dealt with this same contention:

Petitioner also alleges that counsel failed to make proper inquiry during voir dire on the veniremen's possible bias due to pretrial publicity and on their views on capital punishment. This failure allegedly led to exclusion of jurors in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). This allegation suffers the same defect as the previous one. Petitioner has not presented any facts to demonstrate prejudicial pretrial publicity or improper exclusion of veniremen. He has not shown how the veniremen were improperly excluded. At 3.

## V

THE SYSTEMATIC EXCLUSION FOR CAUSE OF VENIREMEN WITH CONSCIENTIOUS OBJECTIONS TO THE DEATH PENALTY DENIED PETITIONER HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO A JURY THAT WAS IMPARTIAL AS TO GUILT AND NOT BIASED IN FAVOR OF THE PROSECUTION AND A JURY THAT WAS A REPRESENTATIVE CROSS-SECTION OF THE COMMUNITY.

Petitioner argues under this point that he was tried by an unconstitutional jury in that a distinct group was excluded, i.e., those jurors that could not render a death penalty and that the resulting jury was composed of persons who were prosecution oriented. He relies on footnote 18, p. 520, footnote 18, p. 1776 in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Petitioner states that while evidence concerning the death qualified jury was "too tentative and fragmented in 1968," this is no longer the case. He cites a number of studies and law review articles on the subject.

Petitioner's argument must fail for several reasons. First, there is nothing in the trial record or habeas record to show that any juror was excused for Witherspoon reasons. Secondly, no objection was made to the composition of the jury at the trial. Under the decision of the Supreme Court in

*Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) this issue is raised too late and does not come within the "cause and actual prejudice" exception recognized in that case. Nor is the "cause-and-prejudice" exception outlined in Wainwright obviated by consideration of this issue on its merits by the state courts. See *Euell v. Wyrick*, 675 F.2d 1007 (8th Cir. 1982) and cases cited therein, particularly *Ulster County v. Allen*, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979). This issue was never raised or decided on its merits in the trial court or in the several proceedings in the Supreme Court of Arkansas.

No legal "cause and actual prejudice" has been advanced in the failure to raise this issue in a timely fashion, if in fact an issue existed at all—which is by no means certain. "We reaffirm, therefore, that any prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief." *Engle v. Isaac*, —— U.S. ——, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). This affirmation of *Wainwright v. Sykes, supra* was further strengthened on the same date in *United States v. Frady*, —— U.S. ——, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). "Contrary to Frady's suggestion, he must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at ——, 102 S.Ct. at 1596. As previously indicated, the evidence of petitioner's guilt is overwhelming. In fact in all material respects it was admitted in a voluntary statement and on the witness stand. What the Supreme Court said in *Frady* is particularly applicable here. "At the outset, we emphasize that this would be a difficult case had Frady brought before the District Court affirmative evidence indicating that he had been convicted wrongly of a crime of which he was innocent .... The evidence, however, was overwhelming...." *Id.* at ——, 102 S.Ct. at 1596.

Thirdly, the petitioner in the habeas corpus hearing presented no proof as contem-

plated by the *Witherspoon* footnote mentioned *supra*. The only reference to the argument is in the post trial brief where, as noted above, there are citations to a number of articles dealing with the subject. In *Grigsby v. Mabry*, 637 F.2d 525 (8th Cir. 1980) the Court of Appeals held that it was error to refuse to permit a defendant to make proof on this issue in his trial.[15] The state court had refused a continuance to permit Grigsby to make his proof and Chief Judge Eisele held that the state should grant him an evidentiary hearing on his constitutional claim and allow him to appeal the decision or retry him. *Grigsby v. Mabry*, 483 F.Supp. 1372 (E.D.Ark.1980). The Court of Appeals agreed that Grigsby was entitled to an evidentiary hearing but that Judge Eisele should conduct it. This is not the situation in the case at bar where no proof was made or sought to be made on this issue at the trial. It should be noted in a situation similar to the instant case Judge Eisele rejected the right to introduce this issue in a habeas hearing when it had not been addressed at the trial in a timely fashion. *Hulsey v. Sargent*, PB–C–81–2 (E.D. Ark.1981). Judge Overton has rendered a similar decision in *Collins v. Lockhart*, PB–C–81–271 (E.D.Ark.1982).

## VI

### PETITIONER WAS DENIED HIS RIGHT TO A FAIR AND IMPARTIAL JURY SELECTED THROUGH FAIR PROCEDURES BY THE FAILURE OF THE TRIAL COURT TO CONDUCT AN INDIVIDUAL, SEQUESTERED VOIR DIRE OUTSIDE THE PRESENCE OF THE ENTIRE PANEL.

■ The only statement in petitioner's post trial brief concerning this issue is as follows:

Petitioner is not abandoning this contention, but recognizes that at the present time the failure to conduct individual, sequestered *voir dire* does not rise to the level of constitutional error. This

allegation is more properly addressed with regard to the claim of ineffective representation and is discussed in Point I above. At 43.

Since petitioner does not abandon this argument, a few comments are in order. In the Rule 37 petition Pickens raised the same point. In its unpublished opinion of November 3, 1980, the Supreme Court of Arkansas said:

It is alleged that these failures led to a "superficial jury selection process." Petitioner has not supported this conclusory allegation with specific facts nor has he cited any authority to show that these alleged failures were error. We cannot find any prejudice to petitioner. At 3.

It should also be noted that while the jury panel was not sequestered for the voir dire, it was for the most part conducted on an individual basis, according to one of petitioner's own witnesses. (Isbell Dep. 55).

## VII and VIII

### PETITIONER WAS DENIED DUE PROCESS OF LAW BY THE IMPOSITION OF THE PENALTY OF DEATH BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE JURY'S FINDING OF AGGRAVATING CIRCUMSTANCES(d), THAT THE CAPITAL FELONY WAS BEYOND A REASONABLE DOUBT COMMITTED FOR THE PURPOSE OF AVOIDING OR PREVENTING A LAWFUL ARREST OR EFFECTING AN ESCAPE FROM CUSTODY, WHEN THAT CIRCUMSTANCE IS PROPERLY DEFINED.

### THE ARKANSAS SUPREME COURT ADOPTED IN THIS CASE SUCH A VAGUE AND VARYING INTERPRETATION OF AGGRAVATING CIRCUMSTANCE (d) AS TO VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.

■ The jury found three aggravating circumstances, one of which was that the

---

**15.** The court noted as follows in n. 3 at 527: "Several courts have declined to find there exists sufficient evidence available on the record before them to prove the conviction propensities of death qualified juries. (Citing cases.)"

petitioner did, beyond a reasonable doubt, commit the capital felony murder for the purpose of preventing a lawful arrest or effecting an escape from custody. The jury's finding in this regard was affirmed on appeal. The Court said:

> There is substantial evidence to support the jury's findings on each of the above facts and in the absence of any mitigating circumstances, we can find no basis in the record to hold that the sentence of death was wantonly or freakishly imposed against appellant. Like *Neal v. State* [548 S.W.2d 135], *supra*, this is just another example of a robber who makes the cold-blooded calculation that by annihilating his victim he thereby eradicates an eyewitness to his crime. 551 S.W.2d at 215.

Petitioner argues that there was insufficient evidence to support this finding, since properly and narrowly construed, this circumstance is only applicable in the situation where there is an actual attempt to arrest or an actual escape attempt.

Great deference should be given to the interpretation of an Arkansas statute by the Arkansas Supreme Court. This is particularly true if the interpretation appears to be reasonable. To me the application of the statutory language to the facts in this case is eminently reasonable. Pickens himself said that the people were shot to avoid detection and apprehension. He quoted Antonio Clark just before the shooting: "Wait a minute. They will bust us. They have seen the car." (Tr. T. 210) Even under an extremely narrow interpretation of this language, it seems to me that these people were shot to prevent or avoid a lawful arrest. Petitioner argues that such an interpretation makes this aggravation factor applicable to any felony murder because it can always be said that the elimination of the victim eliminates an eyewitness. I cannot accept such an argument. Here, it appears to me as it appeared to the Supreme Court of Arkansas that there was a cold-blooded deliberate attempt to murder all the robbery victims and the rape victim because they had seen and could identify the car in which the robbers and rapists were making their escape.

## IX

THE JURY WAS REQUIRED AS A MATTER OF LAW TO FIND AS A MITIGATING CIRCUMSTANCE THAT THE CAPITAL FELONY MURDER WAS COMMITTED BY ANOTHER PERSON AND THE PETITIONER WAS MERELY AN ACCOMPLICE OR HIS PARTICIPATION RELATIVELY MINOR.

Petitioner does not argue this point orally or in his posttrial brief. We find it to be completely without merit. As noted previously, there was evidence from which the jury could have inferred that petitioner participated in the execution of the victims. By no stretch of the imagination could petitioner's participation in this episode be considered "minor."

## X

PETITIONER'S SENTENCE WAS RENDERED IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE BOTH THE CHECKLIST PROCEDURE USED BY THE TRIAL COURT AND ITS INSTRUCTIONS TO THE JURY CONSTRAINED THE JURY'S CONSIDERATION OF MITIGATING CIRCUMSTANCES AND DENIED THE JURY THE OPPORTUNITY TO CONSIDER, IN RENDERING ITS DECISION, ALL MITIGATING CIRCUMSTANCES AT ALL RELEVANT TIMES.

Petitioner did not argue this point or cite any authority therefor in the hearing or in his posttrial brief. His contention is not supported by the record. Under Verdict Form B (Mitigating Circumstances), subsection (e), appears the following:

(e) Place check mark in the appropriate space:

( ) Additional mitigating circumstances not mentioned above exists.

(X) Additional mitigating circumstances not mentioned above do not exist. (If such other circumstances are found to exist, please indicate them on the reverse side of this form.)

This subsection was specifically explained in the Court's instructions (Tr. T. 240).

## XI

PETITIONER'S SENTENCE OF DEATH VIOLATES HIS RIGHTS UNDER THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE CONTRARY TO THE PROPER APPLICATION OF THE STATUTE, HE WAS REQUIRED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT MITIGATING CIRCUMSTANCES OUTWEIGHED AGGRAVATING CIRCUMSTANCES.

█ Petitioner made no argument on this point at the hearing or in his posttrial brief. The record does not support this contention in the sentencing form of the verdict. The jury was required to find each aggravating circumstance *beyond a reasonable doubt* (Tr. T. 43–45). The jury was only required to find mitigating circumstances (Tr. T. 46–48). No such rigorous test was applied to mitigating circumstances as to aggravating circumstances. The jury was then asked to find whether or not the mitigating circumstances were sufficient to outweigh the aggravating circumstances (Tr. T. 49–50). Thus, the State was required to meet a far higher standard of proof on aggravating circumstances then the petitioner was required to meet on mitigating circumstances. These verdict forms and the Court's instructions relating thereto (Tr. T. 238–42) were as favorable to petitioner as he had a right to ask. Petitioner made no objection to the verdict form or to the Court's instruction regarding the verdict forms.

## XII and XIII

IMPOSITION OF THE DEATH PENALTY UPON PETITIONER VIOLATED HIS RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE NO COMPARATIVE REVIEW WAS REQUIRED OF, OR PERFORMED BY, THE APPELLATE COURT.

PETITIONER WAS DENIED RIGHTS SECURED BY THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE THE PENALTY OF DEATH IS IMPOSED IN ARKANSAS IN AN ARBITRARY AND CAPRICIOUS MANNER AND SUCH WAS DONE IN PETITIONER'S CASE.

█ Petitioner in his post-trial brief has included statistics on the disposition of capital cases broken down by judicial districts. There are twenty such districts in Arkansas. From these statistics petitioner states that a capital defendant is more likely to receive the death penalty if he is tried in certain areas of the State. He groups the Seventeenth District with certain other districts to comprise what he arbitrarily calls a Northeast Arkansas District and states that in this northeast district a capital defendant has a record of receiving the death penalty 50% of the time while in northwest Arkansas the death penalty has been imposed only 27.7%. We have problems with petitioner's geographical groupings and his failure to present information about the nature of these cases. We also doubt that any real conclusion can be fairly drawn from these sketchy statistics. Petitioner says that "freakishness" in the imposition of the death penalty is illustrated by these statistics. They were not offered in the habeas hearing. To illustrate the compilation technique, the following cases are listed for the Seventeenth District:

| YEAR | CAPITAL DEFENDANT | JURY | PLEA | DISPOSITION | DEATH PENALTY WAIVED (W) OR NOT WAIVED (NW) |
|------|-------------------|------|------|-------------|---------------------------------------------|
| 1975 | Porter Rogers, Sr. | X | | M–1, life | NW |
| 1975 | William Barry Kimbrell | X | | M–1, life | NW |
| 1976 | Charles Pickens | X | | death | NW |
| 1976 | Sherwood Gooch | | X | life w/o | W |
| 1977 | Antonio Clark | X | | death | NW |

Of the five cases listed, three were participants in the Casscoe murders. Two of them received the death penalty. One (Gooch), who according to witnesses was absolved from firing any of the shots, received life. The only other two capital defendants in this district received life imprisonment. This small sample hardly demonstrates that the death penalty was "freakishly" imposed in this judicial district. Nor can such a conclusion be drawn from the figures in other districts or in the State as a whole without a great deal more data. Finally, we have serious doubts as to whether this evidence can be considered in view of its having been first presented in the posttrial brief.

## XIV

THE SYSTEMATIC EXCLUSION FOR CAUSE OF VENIREMEN WITH CONSCIENTIOUS OBJECTIONS TO THE DEATH PENALTY WITHOUT ADEQUATE INQUIRY UPON *VOIR DIRE* DENIED PETITIONER TRIAL BY A JURY THAT REFLECTED CONTEMPORARY STANDARDS OF DECENCY IN THE ASSESSMENT OF THE PENALTY OF DEATH.

This point has been covered previously in this opinion. At the outset we must again point out that there is no proof in the trial record or the habeas hearing that there was "systematic exclusion for cause of veniremen with conscientious objections to the death penalty without adequate inquiry upon voir dire." There is no evidence whatsoever that an adequate voir dire was not conducted. As a matter of fact, the evidence in the habeas hearing is to the contrary. There is no evidence in the record as to what veniremen, if any, were excused because of opposition to the death penalty. Under the authority of *Witherspoon v. Illinois, supra* in certain circumstances such jurors can be challenged for cause. There is no indication whatsoever in this record that the dictates of *Witherspoon* were not observed.

## XV

PETITIONER'S DEATH SENTENCE IS A CRUEL AND UNUSUAL PUNISHMENT FORBIDDEN BY THE EIGHTH AND FOURTEENTH AMENDMENTS.

Petitioner states that he is not abandoning this contention but chooses not to brief it. This contention must have been considered by the Supreme Court on the petition for certiorari because Justices Brennan and Marshall dissented on the very ground now raised by petitioner, i.e. that the death penalty constitutes cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. Regardless of the extent of consideration to be accorded to denial of the petition of certiorari to the Supreme Court of Arkansas, the majority of the Supreme Court in *Furman v. Georgia, supra*, rejected petitioner's contention. As late as May 24, 1982 the Supreme Court upheld a death penalty conviction on habeas review, Justices Brennan and Marshall dissenting. *Hopper v. Evans*, —— U.S. ——, 102 S.Ct. 2049, 72 L.Ed.2d 367.

## XVI

PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO COUNSEL AT A CRITICAL STAGE OF THE PROCEEDING AND HIS FIFTH AMENDMENT RIGHT AGAINST SELF–INCRIMINATION BY THE FAILURE OF THE ARRESTING OFFICERS TO SCRUPULOUSLY ADHERE TO PETITIONER'S ASSERTION OF HIS RIGHT UNDER *MIRANDA* TO TALK TO AN ATTORNEY.

 Petitioner states that this issue was never fully and fairly litigated at trial or on appeal. The arresting officers testified that they read petitioner his Miranda rights and that he signed a Miranda waiver (Tr. T. 91, 100, 106, 115). At no time did he request a lawyer (Tr. T. 93). Petitioner admitted at the *Denno* hearing that he read and understood his rights and that he signed a rights waiver (Tr. T. 110–11). I credit the testimony of the officers, particularly in view of the documents executed by petitioner and find that he was given his rights under *Miranda.*

## XVII

PETITIONER WAS DENIED A FAIR TRIAL DUE TO EXTENSIVE PRETRIAL PUBLICITY WHICH WAS NOT CURED BY THE TRIAL COURT'S CHANGE OF VENUE TO THE SOUTHERN DISTRICT OF PRAIRIE COUNTY.

 Prior to the trial of the cause, petitioner adopted a motion in which it was said that the pre-trial publicity "*has led the people in this district of this county* to believe that the defendant must be guilty." (Tr. T. 13) Reference was to Arkansas County where the crime was committed. The trial court then granted a change of venue to the Southern District of Prairie County. Nowhere in this record is there any allegation, let alone any proof, that petitioner was harmed by pre-trial publicity in Prairie County where the case was eventually tried.

## XVIII

PETITIONER WAS DENIED DUE PROCESS OF LAW BY THE TRIAL COURT'S GIVING JURY INSTRUCTION 9A BECAUSE:

A. INSTRUCTION 9A DID NOT PROPERLY STATE THE LAW IN EFFECT AT THE TIME;

B. INSTRUCTION 9A IMPROPERLY INJECTED THE SUBJECT OF PUNISHMENT INTO THE GUILT PHASE OF THE BIFURCATED TRIAL;

C. INSTRUCTION 9A WAS IN CONFLICT WITH OTHER INSTRUCTIONS, THEREBY MISLEADING AND CONFUSING THE JURY IN ITS GUILT AND SENTENCE DETERMINATIONS;

D. INSTRUCTION 9A PRECLUDED THE JURY'S CONSIDERATION OF MITIGATING CIRCUMSTANCE (D)

 The trial court instructed the jury as follows:

Members of the jury, you are instructed that in all criminal cases the distinction between accessories and principals has been abolished and that accessories and principals are subject to the same punishment. The law declares an accessory to be any person who stands by, aids, abets or assists, or who not being present, aiding, abetting or assisting, hath advised and encouraged the perpetration of the crime. Therefore, if you find that this defendant aided, abetted or assisted in the perpetration of the crime you shall assess his punishment as if he were a principal. (Tr. T. 231)

Petitioner states that this instruction was determined to be erroneous by the Supreme Court of Arkansas in *Brewer v. State*, 271 Ark. 254, 608 S.W.2d 363 (1980). In that case the trial court gave Arkansas Model Criminal Instruction 401 which reads as follows:

In this case the State does not contend that _____ [each] acted alone in the commission of (defendant (s)) the offense(s) of _____ A person is (offense(s) charged) criminally responsible for the conduct of another person when he is an accomplice in the commission of an offense.

An accomplice is one [who directly participates in the commission of an offense or] who, with the purpose of promoting or facilitating the commission of an offense:

[Solicits, advises, encourages or coerces the other person to commit the offense;] [or]

[Aids, agrees to aid, or attempts to aid the other person in planning or committing the offense;] [or]

[Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so.]

but added thereto, "The punishment for an accomplice is the same as that of a principal." This was held to be error. The Supreme Court said:

Even though the jury was entitled to an instruction concerning an accomplice, this was not the place in the trial when it should have been given. Also, it is a misstatement of the law as it says the punishment for an accomplice is the same as that of a principal when in fact the law states that an accomplice may be punished the same as a principal. Also, he could receive a sentence less than the principal. 608 S.W.2d at 369.

It should first be observed that no objection was made to this instruction in the trial court, in the direct appeal to the Supreme Court, or in the Rule 37 petition denied by the Supreme Court of Arkansas in a lengthy per curiam order issued November 3, 1980. The habeas petition is the first intimation that this instruction denied petitioner his constitutional rights.

*Henderson v. Kibbe*, 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) involved a habeas attack on a state court conviction based upon an erroneous jury charge. Unanimously reversing the Court of Appeals, the Supreme Court said:

Orderly procedure requires that the respective adversaries' views as to how the jury should be instructed be presented to the trial judge in time to enable him to deliver an accurate charge and to minimize the risk of committing reversible error. It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.

The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. At 154, 97 S.Ct. at 1736.

*Henderson v. Kibbe, supra* was recently strongly reaffirmed in *United States v. Frady*, —— U.S. ——, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), a federal criminal case in the District of Columbia. Just as in the instant case, Frady attacked a murder conviction because certain instructions had been determined to be erroneous in later decisions but were not objected to at the trial. "The District Court denied Frady's § 2255 motion, stating that Frady should have challenged the jury instructions on direct appeal, or in one of his many earlier motions." *Id.* at ——, 102 S.Ct. at 1590. The Court of Appeals reversed holding that the "plain error" standard of Fed.R.Crim.P. 52(b) should apply. The "cause and actual prejudice" standard enunciated in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976) and *Davis v. United States*, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973) was rejected by the Court of Appeals. The Supreme Court reversed holding the standard approved in these three cases was applicable:

Under this standard, to obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) "cause" excusing his double procedural default, and (2) "actual prejudice" resulting from the errors of which he complains. In applying this dual standard to the case before us, we find it unnecessary to determine whether Frady has shown cause, because we are confident he suffered no actual prejudice of a degree sufficient to justify collateral relief nineteen years after his crime.

In considering the prejudice, if any, occasioned by the erroneous jury instructions used at Frady's trial, we note that in *Wainwright v. Sykes* we refrained from giving "precise content" to the term "prejudice," expressly leaving to future cases further elaboration of the significance of that term. 433 U.S., at 91, 97 S.Ct., at 2508. While the import of the term in other situations thus remains an open question, our past decisions nevertheless eliminate any doubt about its meaning for a defendant who has failed to object to jury instructions at trial.

Recently, for example, Justice Stevens, in his opinion without dissent in *Henderson v. Kibbe, supra,* summarized the degree of prejudice we have required a prisoner to show before obtaining collateral relief for errors in the jury charge as " 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.' " 431 U.S., at 154, 97 S.Ct., at 1736 (citations omitted). We reaffirm this formulation, which requires that the degree of prejudice resulting from instruction error be evaluated in the total context of the events at trial. As we have often emphasized: "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. 141, 146–147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) (citations omitted). Moreover, "a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction." *Id.* at 147, 94 S.Ct. at 400. ——, 102 S.Ct., at 1595–97.

*Hopper v. Evans, supra,* should also be noted. Evans was sentenced to death in an Alabama court for killing a robbery victim. At the time of his trial, an Alabama statute precluded jury instructions on lesser included offenses in capital cases. Pending appeal and after state appellate affirmation and denial of a habeas petition in U. S. District Court, the Supreme Court decided *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) and invalidated the Alabama statute. The Court of Appeals then reversed the District Court's denial of the habeas petition filed by Evans, holding that the Alabama preclusion statute had "infected" the trial. The Supreme Court reversed, holding that the Alabama preclusion clause did not prejudice respondent in any way. His own evidence negated the possibility that a lesser included offense instruction might have been warranted.

Based on these cases we fail to find that there was "actual prejudice" to the petitioner in the giving of the instruction. The instruction was given in the guilt phase of the case. Evidence of petitioner's guilt was overwhelming. In fact the State's evidence is very convincing that far from being an accomplice, Pickens was a major participant in the crime whose behavior was no less reprehensible than the other two defendants.

In the penalty phase of the case in one of the verdict forms, B(d) dealing with mitigating circumstances, the jury was asked to decide whether or not "the capital felony was committed by another person and the defendant was an accomplice or his participation relatively minor." The jury decided and there was substantial evidence to support its conclusion that (1) the capital felony was not committed by another person; (2) defendant was not an accomplice; and (3) defendant's participation was not relatively minor. Under this factual determination by the jury, we fail to see how defendant was prejudiced by anything the jury was told about the punishment of an accomplice or the degree of his guilt.

## XIX

PETITIONER'S RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS WERE VIOLATED BY HIS ARREST WITHOUT PROBABLE CAUSE AND BY A SEARCH THAT WAS UNCONSTITUTIONALLY BROAD IN SCOPE AND INCIDENT TO THAT ILLEGAL ARREST.

 This point is totally without merit. The Supreme Court of Arkansas dealt to some extent with this contention in its opinion on direct appeal. "We do not understand the law to require a search warrant before the police can search an abandoned vehicle from which a defendant flees to prevent apprehension by the police" 261 Ark. 756, 551 S.W.2d 212, 215 (1977). Especially is this true when the car is stolen and its owner has been murdered (Ha. T. 235), and in a locality where there have been other multiple murders by the occupants of an automobile of the same description. *See United States v. Ross*, —— U.S. ——, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). With regard to the claimed illegality of the arrest, it is noted that an illegal arrest does not bar prosecution for a crime:

> Insofar as respondent challenges his own presence at trial, he cannot claim immunity from prosecution simply because his appearance in court was precipitated by an unlawful arrest. An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction. *United States v. Crews*, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980).

## XX

THE ARKANSAS DEATH PENALTY STATUTE IS FACIALLY UNCONSTITUTIONAL BECAUSE IT DISCOURAGES ASSERTION OF THE FIFTH AMENDMENT RIGHT NOT TO PLEAD GUILTY AND PENALIZES EXERCISE OF THE SIXTH AMENDMENT RIGHT TO TRIAL BY JURY.

 The identical point was raised by the defendants in *Ruiz & Denton v. State*, 275 Ark. ——, 630 S.W.2d 44 (1982) and rejected. We adopt the reasoning of the Arkansas Supreme Court. We also agree with the Arkansas Court that *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968) on which petitioner relies is distinguishable.

## CONCLUSION

Petitioner argues that there are numerous reasons why *Wainwright v. Sykes, supra* is not applicable to this case. We do not agree. We concede that if the state court did not enforce a procedural bar but considered an issue on its merits, then the federal courts are free to consider the issue on its merits. *Ulster County Court v. Allen*, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979). We also concede that if the procedural default was due to the ineffectiveness of counsel, then this may satisfy the "cause" requirement of *Wainwright*. *See Rinehart v. Brewer*, 561 F.2d 126, 130, n. 6 (8th Cir. 1977). "Actual prejudice" still has to be shown, however. As noted in the course of this opinion, there are issues raised by defendant to which *Wainwright* does apply. Its application is not avoided by a "plain error" rule or a rule obtaining in Arkansas that all errors prejudicial to the rights of defendant must be reviewed in a capital case.

In our view, the only troublesome issue in this case is whether petitioner received effective assistance of counsel in the sentencing phase of his trial. After full consideration of the trial record and the record made at the habeas hearing, we conclude that the constitutional standards were met in this trial. Assuming that counsel did not meet the standard of effectiveness applied in this Circuit (which we do not find to be the case), we would be constrained to hold that the petitioner was not prejudiced thereby. In the highest tradition of the Bar, petitioner has been ably and most conscientiously represented by his appointed counsel in the federal proceedings. The habeas hearing was conducted with skill and a thorough

and comprehensive brief has been filed by his counsel. In spite of the herculean exertions by counsel, we must deny the petition.